ROBERT ASMAR and KATHLEEN ASMAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Asmar v. Commissioner
Docket No. 7556-73.
United States Tax Court
T.C. Memo 1976-213; 1976 Tax Ct. Memo LEXIS 192; 35 T.C.M. (CCH) 930; T.C.M. (RIA) 760213; June 30, 1976, Filed Raymond E. Caruso, for the petitioner Robert Asmar. Frank R. Ciesla, for the petitioner Kathleen Asmar. Agatha L. Vorsanger, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined the following *193 deficiencies in petitioners' income tax plus additions to tax under section 6653(b): [1]
Additions to tax TYE
Deficiency
under sec. 6653(b)
December 31, 1965
$ 4,364.33
$2,182.17
December 31, 1966
11,320.91
5,660.46
December 31, 1967
5,096.61
2,548.31
December 31, 1968
7,624.59
3,812.30
Concessions having been made, the issues remaining for our decision are as follows: 1. Whether petitioners understated their gross income for the years at issue in the amounts determined by respondent; 2. Whether petitioners should be allowed deductions for automobile expenses and depreciation and for certain miscellaneous expenses taken on their 1968 return; 3. Whether petitioners' gross receipts for 1968 were understated due to a mathematical error; 4. Whether petitioner Kathleen Asmar should be relieved of liability under the "innocent spouse" provisions of section 6013(e) for any deficiencies determined; and 5. If there were underpayments of income tax for one or more of the years at issue, whether any part of such underpayments was due to *194 fraud within the meaning of section 6653(b) FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Robert and Kathleen Asmar filed joint income tax returns for the years 1965 to 1968, inclusive, with the District Director of Internal Revenue, Newark, New Jersey. In July 1970, petitioners filed amended income tax returns for the years 1966, 1967, and 1968. At the time the petition herein was filed, petitioners resided in Keansburg, New Jersey. Petitioner Robert Asmar was born in 1938 and his wife, Kathleen Asmar, was born in 1940. They were married in December 1957, and during the years at issue had two minor children. In 1975, Kathleen Asmar instituted legal proceedings against her husband in a New Jersey state court for the purpose of dissolving their marriage. From September 1952 to April 1954, Robert Asmar attended Middletown Township High School, Middletown, New Jersey. From August 1954 to June 1955, he attended the Jamesburg Home for Boys. During 1955 and 1956 he also attended Leonardo High School in Middletown and New Jersey Prep School in Newark. While he was in school and until 1959, Robert Asmar worked at several jobs which *195 paid less than $2 per hour. He worked for General Motors for a short period during 1959 and received approximately $2.50 per hour. He left General Motors that year and attended hairdressing school for six months. After his graduation, he worked for Russell Hairdressers but, because he was not making sufficient income, he went back to work at General Motors during 1962 and part of 1963. He again left General Motors and, between 1963 and 1965, he worked as an employee at various beauty salons. In 1965 he opened his own beauty salon, the East of Eden, located in Middletown, New Jersey. In 1959, Asmar purchased a 1959 Buick and paid for the car within one year. In 1960 he purchased a new Cadillac, trading in the 1959 Buick. On January 15, 1963, petitioners purchased a home in Keansburg, New Jersey, for $14,500. They paid $4,500 in cash and obtained a mortgage for the remaining $10,000. During the years 1962, 1963, and 1964, Robert and Kathleen Asmar's gross income as reported on their joint returns was $7,457.84, $7,797.27, and $8,598.10, respectively. Petitioners joint income tax returns for 1962, 1963, and 1964 indicate that during those years Federal income tax (net *196 of refunds) was withheld in the respective amounts of $865.65, $633.23, and $689.50. Further, on their 1963 return they claimed itemized deductions of $2,543.01 (exclusive of applicable limitations), and on their 1964 return the amount of itemized deductions claimed was $2,494.48 (exclusive of applicable limitations). During 1965 petitioner Robert Asmar and his brother, Jerome, took a trip to Puerto Rico for which petitioner paid the O'Donnell Travel Agency $858.15. In that same year, petitioner purchased a Cadillac for which he made an initial cash payment of $3,300. In 1966, petitioners spent $3,450 for a swimming pool, and Robert Asmar spent $750 during that year to purchase a fur coat for his wife. Also, in 1966, petitioners spent $2,327.18 for furniture. Beginning in 1965 Robert Asmar operated his own beauty salon, the East of Eden, which was located on rental premises in Middletown. On February 4, 1968, the salon was totally destroyed by fire. Petitioner continued to operate the business out of his home, and on February 28, 1968, he purchased a new beauty salon in Middletown. Petitioners purchased the new salon for $110,000. They financed this purchase by obtaining *197 a mortgage of $53,484.20 and paying $56,102.61 in cash from their own funds. [2] Of this $56,102.61, $49,930 was derived from a cash bank deposit of that amount made by Robert Asmar on February 21, 1968, to a bank account which he opened on that day. This $49,930 did not originate from any bank account previously maintained by petitioners. Robert Asmar's father, Peter Asmar, operated a small grocery store in Keansburg for approximately 25 years prior to his death in April 1975. Income tax returns filed by Peter Asmar and his wife Mary for the years 1962 through 1967 show the following: Merchandise With-
Net Profit from
drawn for Personal Year
Grocery Store
Other Income
Use
1962
$1,090.23
$3,273.85
$ 3,120.00
1963
2,056.85
1,353.58
1,040.00
1964
1,532.28
370.42
350.00
1965
(741.77)
1,479.47
0
1966
(320.49)
3,534.41
0
1967
1,273.60
3,027.80
0
During the years at issue, petitioner Kathleen Asmar worked as a receptionist at the beauty salon on weekends, the times of most frequent business activity. The salon took in money each day, most of which was usually deposited *198 in a bank account by either Robert or Kathleen. Entries in the salon's books and records were made weekly, and most of such entries were made by Kathleen. Petitioners' income tax returns for the years at issue were prepared by accountants who went to petitioners' home in order to examine the books. Both petitioners were present on these occasions, and both supplied the accountants with the necessary figures. Petitioners first became aware that the Internal Revenue Service was investigating them for possible tax fraud in February 1968, when they were contacted by a special agent. Petitioners filed their 1967 return in April 1968, and their 1968 return in the same month of 1969. The first method by which respondent reconstructed petitioners' income for the years at issue involved an examination of petitioners' bank deposits plus cash expenditures. Petitioners do not dispute the accuracy of the bank deposits determined by respondent, but do contest certain cash expenditures determined for 1965 and 1966. The second method involved the cash hoard of $49,930 which petitioners used on February 28, 1968, as part of the purchase price for their new beauty salon. Petitioners have *199 conceded that this sum did not originate from any bank account they previously maintained. Respondent determined that this cash hoard represented petitioners' earnings from the operation of their beauty salon and reallocated this amount to the years at issue in proportion to the salon's annual gross receipts as redetermined by respondent. [3]
The following figures show the gross income reported by petitioners on their joint returns and the additional income determined by respondent under the above-described methods: Bank Deposits
Reallocations
Gross Income
Plus Cash
of Year
Reported
Expenditures
Cash Hoard
1965
$ 5,034.86
$10,778.85
$ 9,986.00
1966
5,399.49
18,079.43
17,475.50
1967
14,239.17
0
17,475.50
1968
39,080.70
0
4,993.00
OPINION The first issue presented for our decision concerns the two methods by which respondent reconstructed petitioners' income for the years at issue. The burden of proving respondent's determinations to be erroneous lies with petitioners, *200 Thomas B. Jones,29 T.C. 601 (1957), and we find that they have failed to do so. At the outset, it is clear that respondent may employ the bank deposits plus cash expenditures method of reconstructing income when, as here, the taxpayers are unable to produce books and records. John Harper,54 T.C. 1121 (1970). Petitioners do not dispute the accuracy of the bank deposits determined by respondent. The only objections regarding the alleged cash expenditures during the years in issue are the following: Year
Amount Expense
1965
$1,560.00
Food and groceries
858.15
Robert Asmar's trip
to Puerto Rico
1966
1,560.00
Food and groceries
3,450.00
Swimming pool
Robert Asmar claimed that during 1965 and 1966 he and his wife and children received virtually all their food at no cost from his father, Peter Asmar, who operated a nearby grocery store. Robert stated that, during each year, he spent no more than $150 for food from his own funds. The only evidence offered to support this contention was Robert's own testimony, which we were unable to believe. Further, his testimony on this matter is contradicted by his father's *201 1965 and 1966 income tax returns, which show that no food was withdrawn for personal use during those two years. Respondent's estimates of cash expenditures for food during these years are reasonable and are sustained. With respect to the purchase of the swimming pool in 1966, petitioners allege that, because of a dispute with the contractor, they paid less than the contract price of $3,450. Further, they claim that they received gifts of $1,500 from Peter Asmar and $1,000 from Kathleen's father, William Burke (Burke), which amounts they used to purchase the pool. First, petitioners produced no corroborative evidence to show that the pool cost any less than the contract price of $3,450. Second, they were unable to produce any evidence to substantiate the alleged $1,500 and $1,000 gifts. Burke testified that he gave petitioners $2,000 (not $1,000, as Robert testified) to be used for the purchase of the pool and that he obtained this amount by cashing in a life insurance policy. Burke was unable to produce any evidence to substantiate this alleged gift to petitioners. Petitioners' position on this matter is supported only by testimony at trial, and we found such testimony *202 to be both unreliable and contradictory. Accordingly, we must sustain respondent's determination that in 1966 petitioners paid out of their own funds $3,450 for the swimming pool. Finally, based on an $858.15 check dated February 23, 1965, written by Robert Asmar to O'Donnell Travel Agency, respondent determined that petitioner spent such amount for a vacation trip to Puerto Rico with his brother. Asmar first testified that he spent about $125 for the air fare and that his brother paid the other expenses. Later he testified that the bills from the hotel where they stayed were never paid. When respondent's counsel suggested that he had defrauded the hotel, Asmar quickly responded that perhaps his mother or his father paid the hotel bills. Petitioner's testimony on this matter was contradictory and evasive, and we cannot believe it. Accordingly, respondent's determination as to the expenses for the trip in 1965 is sustained. Petitioners also object to respondent's determination that the $49,300 cash hoard, which petitioners used in February 1968, to purchase their beauty salon, constitutes taxable income to petitioners during the years at issue. Respondent's position is *203 that petitioners accumulated the cash hoard from their beauty salon profits. Accordingly, respondent allocated a portion of the total amount to each of the years at issue based on gross receipts. Petitioners contend that the $49,300 cash hoard represents an accumulation of gifts and previously taxed wages which Robert Asmar had saved over many years. We find this explanation unsupported, contradicted by reliable evidence and simply incapable of belief. Because of his Lebanese ancestry, Asmar claimed to have a deep distrust of banks and to have kept cash in a tin box buried underneath his stepmother's house. According to his testimony at trial, Asmar had, by the age of 14, accumulated about $2,000 in cash. He offered no reasonable explanation as to how he had saved this amount at such an early age. Four years later, by 1957, Asmar claimed to have increased his savings in the tin box to $5,000. This was accomplished during a period of time that he attended school and worked at various odd jobs, none of which payed more than $2 per hour. He further testified that by 1962 the cash in his tin box had grown to $20,000. Evidence presented shows that between 1957 and 1962 he *204 continued to hold low paying jobs, had the financial responsibility of supporting a family, purchased a 1959 Buick in one year, and also purchased a new Cadillac in 1960. By 1964, according to his testimony, he had increased the $20,000 in his tin box to $35,000. This feat was accomplished despite the fact that, according to joint returns filed for 1962, 1963, and 1964, petitioners' gross income for those years was $7,457.84, $7,797.27, and $8,598.10, respectively. If one subtracts from these gross income figures petitioners' Federal income tax payments, itemized deductions, and other estimated living expenses, this exercise in frugality becomes even more remarkable. Petitioners would also have us believe that, between 1957 and 1968, they received approximately $21,000 in cash gifts, all of which Robert placed in the tin box. Again, we simply cannot accept this contention. First, these alleged gifts came from persons who were not in the financial position to make large cash gifts. Second, petitioners were able to produce substantiation of only one of these alleged gifts, a check for $1,000 dated October 8, 1962, written by Burke. Burke testified, however, that he gave petitioners *205 this amount toward the purchase of their house. Petitioners did purchase a house in January 1963, for which they made a cash downpayment of $4,500. We think it quite probable that the $1,000 was used for this purpose and was not placed in Robert's tin box. In short and to put it mildly, we find petitioners' story preposterous. It is clear that a cash hoard of $49,300 did, in fact, exist. It is also clear to us that such sum was derived from profits earned by petitioners' beauty salon. Accordingly, respondent's determinations regarding the reallocation of the cash hoard to the years at issue are sustained. Respondent, in addition to reconstructing petitioners' income, also disallowed deductions taken in 1968 of $1,240.58 for automobile expenses, $360 for automobile depreciation, and $705 for miscellaneous expenses. In addition, respondent determined that petitioners understated their 1968 gross receipts by $2,738 due to a mathematical error. Petitioners offered no evidence as to these items, and respondent's determinations are accordingly sustained. Rule 142, Tax Court Rules of Practice and Procedure.
The next issue we must consider is whether Kathleen Asmar should be *206 relieved from tax liability under the "innocent spouse" provisions of section 6013(e). [4]
*207 Section 6013(e) relieves a spouse of joint liability for tax if certain conditions are satisfied. A wife seeking relief under this section must show: (1) a joint return was filed on which there was erroneously omitted an amount of gross income which is attributable to her husband and which is in excess of 25 percent of the gross income stated on the return; (2) in signing the return, she had no reason to know of such omission; and (3) it is inequitable to hold her liable, taking into account all of the facts and circumstances, including the benefits she received from the omitted income. All these requirements must be met before section 6013(e) can operate to relieve a spouse of liability. Howard B. Quinn,62 T.C. 223, 230 (1974), affd. 524 F. 2d 617 (7th Cir. 1975). For taxable year 1968, the gross income stated on petitioners' joint return was $39,080.70. Respondent has determined that the omission from gross income for that year amounted to $4,933. Quite clearly, the 25-percent omission from gross income requirement under section 6013(e)(1)(A) has not been satisfied for 1968 and Kathleen cannot be relieved from liability as an "innocent spouse" *208 for that year. We sympathize with this petitioner and believe her statements concerning the autocratic manner in which her husband controlled her life. However, we are bound by the statute, and we must hold that section 6013(e) is likewise inapplicable for the years 1965, 1966, and 1967. In the first place, the record clearly indicates that Kathleen worked at the beauty salon as a receptionist on the weekends, the time of most frequent business activity. She also was responsible for depositing the salon's receipts in the bank and keeping the salon's books. In short, her efforts as well as her husband's contributed to the salon's financial success, and we are unable to conclude that the omissions from gross income for 1965, 1966, and 1967 were attributable only to her husband. Sec. 6013(e)(1)(A). Second, we think that because of her intimate involvement in the salon's financial affairs, including participating in the preparation of her and her husband's joint returns, she has not established that she did not know, or have reason to know, of the omissions for these years. Sec. 6013(e)(1)(B). The final issue we must decide is whether any part of the underpayment for years *209 1965, 1966, 1967, and 1968 was due to fraud within the meaning of section 6653(b).[5] Respondent has conceded that petitioner Kathleen Asmar is not liable for the additions to tax under section 6653(b) for the years at issue. Respondent bears the burden of proving, by clear and convincing evidence, that some part of the underpayment, for the years at issue was due to fraud with intent to evade tax. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure.
Robert Asmar's failure to carry his burden with respect to the deficiencies determined by respondent is not, by itself, sufficient to prove fraud. Respondent *210 must prove the existence of fraud by affirmative evidence. Luerana Pigman,31 T.C. 356, 370 (1958). Direct proof of fraudulent intent is seldom possible and such intent may be inferred from the facts and circumstances of each case, including the conduct of the taxpayer. M. Rea Gano,19 B.T.A. 518 (1930). Within the context of this legal framework, and after giving careful consideration to the entire record before us, we are convinced that part of the underpayment for each of the years at issue was due to fraud within the meaning of section 6653(b). Accordingly, we hold that petitioner Robert Asmar is liable for the additions to tax provided for under that section. First, the record before us clearly shows that for four successive years petitioner failed to report substantial amounts of income. We are aware that a mere failure to report income does not show fraudulent intent, but substantial understatements of income occurring over an extended period of time constitutes a course of conduct on the part of the taxpayer evidencing such intent. Bryan v. Commissioner,209 F. 2d 822, 828 (5th Cir. 1954); Merrit v. Commissioner,301 F. 2d 484, 487 (5th Cir. 1962). *211 Also, the size of the amounts not reported is quite large in comparison with the income actually reported on the returns.Large and unexplained discrepancies in actual and reported income are further evidence of fraud. Charles A. Rogers,38 B.T.A. 16 (1938), affd. 111 F. 2d 987 (6th Cir. 1940).
We also find persuasive evidence of Asmar's fraudulent intent from his concealment of such a large amount of cash and from the sudden increase in the income reported on his 1967 and 1968 returns once he had become aware respondent was investigating him for fraud. [6]
Also, for the years 1965 and 1966 (the two years that respondent determined additional income by use of the bank deposits plus cash expenditures method), petitioner concedes the correctness of the bank deposits and contests only a few minor cash expenditures. This leaves him in the position of admitting substantial underpayments for those two years. Such an admission evidences fraud. [7]Abraham Galant,26 T.C. 354, 364 (1956).
*212 Fraud may also be presumed from a failure to keep or produce adequate business records. Woodham v. Commissioner,256 F. 2d 201 (5th Cir. 1958). Petitioner's position on this point is confusing. At trial, testimony was presented to show that the beauty salon's records for 1965, 1966 and 1967 were destroyed in the February 4, 1968, fire, and we did not understand respondent to argue otherwise. On brief, however, petitioner states, "[There] is no contention by respondent that petitioner's records are inadequate or non-existent." If petitioner is now arguing that he has in his possession adequate business records for these years, we think his failure to produce such records before or during trial of his case is additional evidence of his fraudulent intent. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
2. The balance came from a tax credit of $413.19.↩
3. Apportionment to 1968 took into account only the business receipts for January and February because the hoard came to light on February 21, 1968.↩
4. SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE. * * *
(e) Spouse Relieved of Liability in Certain Cases.-- (1) In General.--Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. (2) Special Rules.--For purposes of paragraph (1)-- (A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and (B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A).↩
5. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩
6. On this latter point, see Harold S. Lutsko,T.C. Memo. 1969-78↩.
7. We realize, however, that fraud must be proved for each of the years at issue. Harry Gleis,24 T.C. 941 (1955), affd. 245 F. 2d 237↩ (6th Cir. 1957). Therefore, evidence of fraud for 1965 and 1966 does not support our similar finding for 1967 and 1968.