UNITED STATES of America, Appellant,

v.

Robert ASMAR and Kathleen Asmar.

No. 86–5585.

United States Court of Appeals, Third Circuit.

Argued May 20, 1987.

Decided Aug. 27, 1987.

Roger M. Olsen, Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Richard J. Driscoll (Argued), Richard Farber, U.S. Dept. of Justice, Tax Div., Washington, D.C., for appellant; Thomas W. Greelish, U.S. Atty., of counsel.

Richard L. Friedman (Argued), Sharlene A. Hunt, Giordano, Halleran & Ciesla, Middletown, N.J., for appellee Kathleen Asmar.

Before SLOVITER, BECKER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal arises from a civil action brought by the IRS against Robert and Kathleen Asmar seeking judgment for income tax deficiencies, penalties and interest for the years 1965–1968. Kathleen Asmar Rosenbaum (Asmar), among other defenses, asserts that the IRS was estopped to obtain judgment against her.

The acts that Asmar claims constitute estoppel are a series of representations made to her by low-level Internal Revenue Service employees. Asmar asserts that it was represented to her that the IRS would not take action against her to collect an adjudicated tax liability, but rather, that the IRS would seek payment from her former husband and joint obligor, Robert Asmar. The district court ruled in Ms. Asmar's favor. We reverse.

### I.

Married in 1957, Kathleen and Robert Asmar separated in 1973, and obtained a divorce decree in November of 1977. In 1976, the Tax Court held that the Asmars were jointly and severally liable for substantial tax deficiencies for the tax years 1965 through 1968. *See Asmar v. Commissioner*, 35 T.C.M. (CCH) 930 (1976). The Tax Court held Kathleen Asmar was not entitled to an innocent spouse exemption from tax liability. In addition, the Tax Court, holding that Robert Asmar committed fraud by underreporting his tax liability, assessed fraud penalties against Robert individually. The outstanding joint tax liability, including interest, totalled $60,867.31 in November 1982. Robert Asmar's individual liability for the assessed fraud penalties stood at $22,749.31 at the same point in time. At oral argument before this court, it was estimated that the current outstanding joint tax liability was approximately $100,000.

Following the 1976 tax adjudication, the IRS began efforts to collect the joint tax liabilities of the Asmars and the individual liability of Robert Asmar. Kathleen Asmar was notified on November 10, 1976 that assessments were being made against both her and her estranged husband. The IRS demanded payment from Robert Asmar in January 1977, and he responded that he was unable to pay. In February 1977, the IRS demanded payment from Kathleen Asmar, who also responded that she was unable to pay. In January and March 1977, both Kathleen and Robert received notice of the imposition of federal tax liens on their property.

In August 1977, Revenue Officer Richard Byrnes, an IRS employee in the Asbury Park office, requested permission from the special procedures staff of the IRS to file a federal tax lien against East of Eden,[1] to prevent the transfer of the property while the tax liabilities were unpaid. Also during August 1977, Byrnes called Kathleen Asmar to schedule a meeting to discuss her tax liability. During the meeting, Kathleen Asmar signed an affidavit regarding the East of Eden business, stating that she owned 10% of the corporation and her estranged husband owned the remaining 90%. App. at 213–14.

---

**1.** East of Eden is Robert Asmar's corporation, of which Kathleen Asmar originally owned 10%. Apparently, the business originated as a beauty salon, and eventually developed into a corporation owning commercial property and several businesses, including a tavern named the Midnight Rambler.

The Asmars were legally divorced in New Jersey Superior Court on November 7, 1977. Under the terms of the divorce agreement, Kathleen Asmar received and now fully owns two houses on Seeley Avenue in Keansburg, New Jersey. Liens were placed on this property in February of 1977. She and her current husband reside in one of the houses, and her daughter and her daughter's family reside in the other. In addition to ordering the transfer of all title in the Seeley Avenue houses to Kathleen Asmar, the New Jersey Superior Court ordered that Robert Asmar hold Kathleen Asmar harmless from all liens and judgments in his name, or in the name of East of Eden, and to pay the taxes outstanding on the property. App. at 60.

Soon after the divorce, in November of 1977, Byrnes called Kathleen Asmar again to make arrangements to pay off the tax lien on her property. Kathleen Asmar showed him a copy of her divorce agreement and was told by Byrnes that the IRS would proceed against Robert Asmar instead.

In January of 1978, the Regional Counsel of the IRS granted permission for a nominee lien[2] to be filed against East of Eden. Byrnes' request for a levy, however, was denied. In a memorandum dated February 21, 1978, Byrnes requested permission to institute an action to enforce the lien against East of Eden. At that time, Byrnes estimated that the forced sale value of the business would cover the total outstanding tax liabilities. App. at 218.

Over a year later, Byrnes sent a statement detailing the outstanding joint tax liabilities, dated March 23, 1979, to Kathleen Asmar. She testified at trial that she called Byrnes and told him that her attorney had called her to inquire whether she wanted to take legal action against her former husband to collect the back taxes under the terms of the divorce agreement. Byrnes advised her that she should not bother to spend $3,000 for attorney fees to bring an action against Robert, because the IRS was going to do the "same thing."

App. at 268. Asmar testified that she informed her attorney of her conversation with Byrnes. Following the discussion with Byrnes, Kathleen testified that she began to cooperate actively with the IRS by, among other things, informing Byrnes that Robert was hiding his assets by transferring them to relatives and friends.

In the summer of 1980, IRS agent Byrnes was transferred to the Toms River office, and retired shortly thereafter. When Asmar called the Asbury Park office, she was referred to Carl Auther. Asmar called Auther and told him that she was concerned that her former husband was transferring his property to avoid the tax lien on East of Eden. Asmar testified that Auther told her that the IRS was pursuing Robert for the taxes. She called again later and was supposedly told by Auther to "mind her own business" and that the IRS would bring an action against Robert Asmar when it was ready.

After the second call to Auther, Asmar had her lawyer, Joseph Defino, send a letter, dated December 10, 1981, to the IRS. The letter acknowledged that the two houses on Seeley Avenue were subject to the lien, and noted that the lien prevented the transfer of the property. The letter also stated that Robert Asmar had transferred property, including a liquor license, to his girlfriend. App. at 74–75. A second letter to the IRS, dated June 1, 1983, from Kathleen's current attorney, Richard Friedman, listed various assets held by Robert Asmar which could be used to satisfy the outstanding liabilities. App. at 71–73. As the government notes in its appellate brief, neither of these letters state that Kathleen was foregoing her right to enforce her divorce judgment because of the IRS agents' representations.

## II.

The government filed this suit against Kathleen and Robert Asmar on November 9, 1982, seeking judgment on the assessed taxes. Kathleen Asmar filed an answer

---

**2.** A nominee lien is a lien that has been placed upon a corporate alter ego or nominee of a debtor. At the time the lien was filed East of Eden was a corporation wholly owned by Robert Asmar, who was indebted to the government for tax liabilities.

raising an estoppel defense, as well as the affirmative defenses of failure to state a claim upon which relief can be granted, statute of limitations, estoppel and waiver, laches, and the failure to mitigate damages. In addition, she filed cross-claims against Robert Asmar for contribution and indemnification.

On September 23, 1983, the district court granted the government's motion for summary judgment against Robert Asmar, but denied it against Kathleen Asmar, basing its decision upon *Community Health Services of Crawford County v. Califano*, 698 F.2d 615 (3d Cir.1983), *rev'd sub nom. Heckler v. Community Services of Crawford County*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).

After the Supreme Court's reversal of the *Crawford County* decision, the government renewed its motion for summary judgment. A bench trial was held on December 18, 1985.[3] Asmar's testimony is outlined above. She also testified that, on the basis of Byrnes' assurances to her, she did not bring an action against Robert to enforce the divorce agreement. App. at 187.

Carl Auther, the IRS agent, testified that he had never been assigned the Asmar case and that he never told Asmar that the IRS was going after Robert on their joint liabilities. He did acknowledge that he received a call from someone saying she was Kathleen Asmar, and, believing that the caller was referring to Robert's individual liabilities, he told the woman that the IRS would not proceed against her.

While Revenue Officer Richard Byrnes did not appear at the trial because of recent surgery, the district court admitted Byrnes' certified statement that "Mrs. Rosenbaum [Asmar] may have believed from our conversations that in return for her cooperation, because of her real and substantial fear of Robert Asmar, her home and her house across the street which she owned and obtained as a result of the divorce settlement would not be touched by the Internal Revnue [sic] Ser-

vice because it did not appear morally right and would not satisfy all the tax liabilities." App. at 119.

The district court entered judgment in favor of Kathleen Asmar on July 29, 1986. The order dismissed all claims against Kathleen Asmar, and voided all liens against her property.

In support of its decision, the district court made several findings of fact and conclusions of law. The court found that Asmar was "in continual contact with revenue agents and assisting them with information regarding her ex-husband's assets, was continually assured that the Government would go after him and not her ... [and] *[s]he then reasonably relied on these statements by not taking any action herself, to her detriment." United States v. Asmar*, No. 82–3761, slip op. at 7 (emphasis added) [Available on WESTLAW, DCT database]. The district court concluded that the detriment incurred by Asmar was that she "decided to forego the initiation of any action to enforce her rights that she had obtained in the judgment of divorce and is now faced with the entire judgment and the possibility of losing her home." *Id.* at 6. As to the nature of her reliance, the district court held that the revenue officers had apparent authority to take such action, and that Asmar reasonably relied on their statements. The court concluded that failure to grant equitable relief was unconscionable. ___

Since the district court's decision in July of 1986, the IRS has reached a settlement agreement with Robert Asmar. On September 30, 1986, the IRS agreed to release the nominee lien against East of Eden for a payment of $50,000 from Robert Asmar. The amount was applied first to Robert Asmar's individual liability, which at the time of the settlement was $35,815.23. The remaining $14,184.77 was applied to Robert and Kathleen's joint tax liability. Appellant's Brief at 6 n. 4.

In response to this court's request, the parties addressed the question of whether judgment had been entered in Kathleen Asmar's cross-claim against her former

---

**3.** Asmar's answer demanded a trial by jury on all issues. On the day of trial, Asmar waived that demand. App. at 123.

husband, Robert. While the district court's order of July 22, 1986 is somewhat ambiguous, it obviously was intended to award default judgment to Ms. Asmar on her cross-claims against her former husband. The district court clarified this intention by, on May 13, 1987, entering an order *nunc pro tunc* as of July 22, 1986 in favor of Ms. Asmar on her cross-claims.

The United States has timely appealed from the order of the district court entering judgment in favor of Kathleen Asmar and against the government.

### III.

The government contends that the district court erred as a matter of law by holding that the government was estopped from collecting Kathleen Asmar's tax liability. It argues that not only are the traditional requirements of estoppel missing from this case, but that the additional requirement for government estoppel—affirmative misconduct—is lacking. While the government does not challenge the factual findings of the district court, it claims that the conclusions that the district court drew from the findings are incorrect as a matter of law.

Asmar counters that the findings of fact supporting the district court's conclusion of equitable estoppel are not clearly erroneous, and that the necessary elements of government estoppel are present. We agree with the government that the district court erred when it held that the elements of estoppel have been satisfied in this case.

### A.

We are confronted with the question of whether the district court properly invoked the equitable doctrine of estoppel on Ms. Asmar's behalf. Our review is complicated by the fact that this case involves a unique form of estoppel—estoppel against the government—which, while recognized by most circuits,[4] has never been directly addressed by the Supreme Court. *Heckler v. Community Health Services of Crawford County*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *INS v. Miranda*, 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (per curiam); *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam); *INS v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973); *Montana v. Kennedy*, 366 U.S. 308, 81 S.Ct.

---

**4.** Every Circuit Court of Appeals has considered the issue of government estoppel at some point. Their conclusions are disparate, with some circuits adopting a position akin to that of the Third Circuit and others skirting the issue if possible.

The First, Second, Seventh, and Ninth Circuits have adopted approaches to government estoppel similar to that expressed by the Third Circuit in *Community Health Services of Crawford County v. Califano*, 698 F.2d 615 (3d Cir.1983), *rev'd on other grounds sub nom. Heckler v. Community Health Services of Crawford County*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), which requires affirmative misconduct on the part of the government officials. *See, e.g., Akbarin v. INS*, 669 F.2d 839 (1st Cir.1982); *Corniel-Rodriguez v. INS*, 532 F.2d 301 (2d Cir. 1976); *Portmann v. United States*, 674 F.2d 1155 (7th Cir.1982); *Mukherjee v. INS*, 793 F.2d 1006 (9th Cir.1986).

Other circuits have recognized government estoppel as a viable defense, but have adopted dissimilar tests. The Tenth Circuit has stated that the "[a]pplication of the doctrine is justified only where 'it does not interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation.'" *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1416 (10th Cir.1984), *quoting U.S. v. Browning*, 630 F.2d 694 (10th Cir.1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981). The District of Columbia Circuit has noted in *Boulez v. Commissioner*, 810 F.2d 209 (D.C.Cir.1987) that "[c]laims of estoppel arising from the behavior of governmental employees may be asserted only in a narrow category of circumstances." *Id.* at 218 n. 68.

The Fourth, Sixth and the Eighth Circuits, while not ruling out government estoppel, have merely stated that more than the traditional elements of estoppel are necessary to estop the government. *See West Augusta Development Corp. v. Giuffrida*, 717 F.2d 139 (4th Cir.1983); *S.E.C. v. Blavin*, 760 F.2d 706 (6th Cir.1985); *Wellington v. INS*, 710 F.2d 1357 (8th Cir.1983).

The Fifth Circuit has applied government estoppel against the IRS in *Simmons v. United States*, 308 F.2d 938 (5th Cir.1962), but did not adopt—or even address—the appropriateness of an affirmative misconduct standard.

The Eleventh Circuit has to this point avoided deciding "whether to adopt the affirmative misconduct exception to the refusal to estop the government in its sovereign activities." *Lyden v. Howerton*, 783 F.2d 1554, 1558 (11th Cir. 1986).

1336, 6 L.Ed.2d 313 (1961); *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

Yet while the Supreme Court has explicitly refused to recognize government estoppel as a viable defense, it has stated that it is "hesitant ... to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler*, 467 U.S. at 60–61, 104 S.Ct. at 2224–25. This court is one of the majority of circuits which recognize the validity of an estoppel defense against governmental parties. *See Community Health Services of Crawford County v. Califano*, 698 F.2d 615 (3d Cir. 1983), *rev'd on other grounds sub nom. Heckler v. Community Health Services of Crawford County*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).

In *Heckler*, the Supreme Court discussed the traditional elements of a successful estoppel claim, quoting the *Second Draft of the Restatement of Torts*:

> While a hallmark of the doctrine [of estoppel] is its flexible application, certain principles are tolerably clear:
>
> > "If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act ... the first person is not entitled
> >
> > .    .    .    .    .
> >
> > (b) to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before the discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired." Restatement (Second) of Torts § 894(1) (1979).

Thus the party claiming the estoppel must have relied on its adversary's conduct in "such manner as to change his position for the worse," and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading. *Heckler*, 467 U.S. at 59, 104 S.Ct. at 2223.

■ The burden of proof is on the party claiming estoppel. *See Lyng v. Payne*, 476 U.S. 926, ——, 106 S.Ct. 2333, 2340, 90 L.Ed.2d 921, 932 (1986) (a party cannot prevail on an estoppel claim without at least demonstrating the traditional elements of estoppel); *see also Heckler*, 467 U.S. at 61, 104 S.Ct. at 2224. Therefore, to succeed on a traditional estoppel defense the litigant must prove (1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment.

It is, however, "well-settled that the Government may not be estopped on the same terms as any other litigant." *Heckler*, 467 U.S. at 60, 104 S.Ct. at 2224. Additional considerations arise when a party alleges estoppel against the government, for "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Id.*

■ This court, recognizing the "judicial reluctance ... based upon considerations of sovereign immunity, separation of powers and public policy, such as the fear of binding the government by the improper acts of its agents due to fraud and collusion or of the severe depletion of the public treasury," *Lovell Manufacturing v. Export-Import Bank of the United States*, 777 F.2d 894 (3d Cir.1985), has identified a fourth element that must be proven when a party alleges estoppel against the government. Therefore, in this circuit, a litigant must prove "affirmative misconduct" to succeed on an estoppel claim against the government. *See Crawford County*, 698 F.2d 615; *Yang v. INS*, 574 F.2d 171 (3d Cir.1978). A litigant must not only prove the traditional elements of estoppel, but she also must prove affirmative misconduct on the part of the government.[5]

---

**5.** Estoppel has been applied against the Internal Revenue Service in the past. In *Walsonavich v. U.S.*, 335 F.2d 96 (3d Cir.1964), the taxpayer had paid an excise tax which was later found invalid. This court held that the government was estopped from asserting a statute of limitations

The appropriateness of affirmative misconduct as an element of a government estoppel claim has not been addressed by the Supreme Court. Even in its reversal in *Heckler* of this court's decision in *Crawford County*, the Court did not find it necessary to deal with the issue of affirmative misconduct.

*Heckler* involved a double disbursement of funds under the Medicare and CETA [6] programs. The Medicare intermediary, Travelers Insurance Company, had given erroneous advice to Community Health Services of Crawford County, a charitable health care provider. Relying on Travelers' advice, the health care provider received reimbursement funds to which it was not entitled and, as a result, expanded its operations and services. Essentially, Community Health Services claimed that Medicare was estopped from recovering the overpayments. The Supreme Court held in *Heckler* that Community Health Services did not reasonably rely on Travelers' advice to its detriment, and that the lack of detriment and reasonable reliance, both traditional elements of estoppel, were fatal to its estoppel claim.

Therefore, *Heckler* neither addressed nor disturbed the portion of this court's *Crawford County* decision which required that affirmative misconduct had to be proven in order to succeed in a claim of government estoppel. Accordingly, we are still bound by *Crawford County*'s requirement of affirmative misconduct. Our analysis, however, focuses not so much on an affirmative misconduct requirement, but rather on the fact that the record reveals that Asmar suffered no detriment.

### B.

We begin our analysis by examining whether the traditional elements of estoppel, *i.e.*, misrepresentation, reasonable reliance, and detriment, are satisfied by Asmar's claim. The government does not argue that the district court's finding on the IRS agents' misrepresentations [7] was clearly erroneous. Accordingly, it is evident that the first element of traditional estoppel—misrepresentation—has been satisfied. Rather, the IRS argues that Asmar's reliance on the misrepresentations was neither reasonable nor detrimental. Since we conclude that the district court incorrectly ruled that Asmar relied on the IRS's representations to her detriment, we will center our analysis on Asmar's claim of detriment.[8]

As the Supreme Court has noted, "[t]o analyze the nature of a private party's detrimental change in position, we must identify the manner in which reliance on the Government's misconduct has caused the private citizen to change his position for the worse." *Heckler*, 467 U.S. at 61, 104 S.Ct. at 2224; *see also Lyng v. Payne*, 476 U.S. 926, 106 S.Ct. 2333, 2340, 90

---

defense against a taxpayer's refund request stemming from the excise taxes paid.

*Furcron v. U.S.*, 626 F.Supp. 320 (D.Md.1986), summarized the Supreme Court's estoppel jurisprudence and sustained an estoppel cause of action brought by the taxpayers against the IRS. The plaintiffs charged that having paid their taxes by cashiers check three years earlier the IRS was estopped from seeking a second payment from them until after efforts to collect on the cashiers check from the issuing bank had failed. *See also Simmons v. United States*, 308 F.2d 938, 945 (5th Cir.1962) ("It is well-settled that the doctrine of equitable estoppel in proper circumstances, and with appropriate caution, may be invoked against the United States in cases involving internal revenue taxation."); *Tonkonogy v. U.S.*, 417 F.Supp. 78 (S.D.N.Y. 1976) (court invokes equitable estoppel against IRS in favor of ill taxpayer).

**6.** Comprehensive Employment and Training Act of 1973, 29 U.S.C. § 801 et seq (repealed).

**7.** IRS agents do not have the authority to forgive tax liabilities. Any forgiveness or compromise of tax liability must be effected in accordance with the provisions of Internal Revenue Code § 7122, 26 U.S.C. § 7122. A forgiveness of tax liability must be in writing and approved by the Secretary of the Treasury or his authorized delegate. It is clear that a revenue officer does not have the actual authority to forgive or compromise any tax liability. Therefore, to the extent that the IRS agents orally indicated to Ms. Asmar that they would not enforce the tax liens—and that her liability was forgiven or compromised—their statements were misrepresentations.

**8.** Whether "detrimental reliance" is a finding of fact which is reviewed for clear error or a conclusion of law over which we have plenary review, we are satisfied that under either standard of review the district court's ruling on this point was incorrect.

L.Ed.2d 921 (1986) ("An essential element of any estoppel is detrimental reliance."). Therefore, we must assess Asmar's claim that, because of the misrepresentations, she decided not to bring an action against her former husband under the indemnification provision of their divorce agreement, and that, as a result, she suffered detriment.

The district court did not discuss the element of detrimental reliance in detail in its opinion. Rather, it conclusorily stated that Ms. Asmar "reasonably relied on these statements by not taking any action herself, to her detriment." *United States v. Asmar*, slip op. at 7. No further findings were made with regard to this issue. The district court did not find, for instance, that an action brought now by Asmar against her former husband would be futile because Robert Asmar no longer has any assets. Indeed, so far as we can tell, Ms. Asmar did not present any evidence which would demonstrate that initiating an action at this time would be useless or impossible.

The Supreme Court's discussion of detriment in *Heckler* is helpful to our analysis. It will be recalled that, in *Heckler*, the Supreme Court held that a charitable health care provider did not suffer a detriment when it relied on its Medicare intermediary's misrepresentation that grants received from the CETA program did not reduce the amount of Medicare reimbursement to which it was entitled. As a consequence of its reliance—and subsequent Medicare overpayments—the health care provider expanded its operations. The Supreme Court characterized the situation as one in which the party asserting governmental estoppel had suffered no detriment.

> In this case, the consequences of the Government misconduct were not entirely adverse. Respondent [the health care provider] did receive an immediate benefit as a result of the double reimbursement. Its detriment is the inability to retain money that it should never have received in the first place. Thus, this is not a case in which the respondent has lost any legal right, either vested or con-

tingent, or suffered any adverse change in its status. When a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position. Here respondent lost no rights but merely was induced to do something which could be corrected at a later time.

*Heckler*, 467 U.S. at 61, 104 S.Ct. at 2224 (footnotes omitted); *see also Schweiker*, 450 U.S. at 789, 101 S.Ct. at 1471 (the government agent's conduct "did not cause respondent to take action ... or fail to take action ... that respondent could not correct at any time").

The *Heckler* analysis is equally applicable to our case, and consequently, we have difficulty in understanding Asmar's claim of detriment. First of all, as to Asmar's specific claim that she decided not to pursue an action against her former husband, we see no evidence that such an action was possible before but is now foreclosed. Indeed, the district court has already entered default judgment in favor of Kathleen Asmar and against Robert Asmar in the action before us. In essence, Asmar has *already* prevailed in an action against her husband under the divorce agreement. Thus, Asmar now has a judgment of indemnification against her former husband for any judgment rendered against her and in favor of the IRS.

Moreover, Asmar produced no evidence from which the district court reasonably could conclude that had she sought enforcement of her indemnity agreement prior to the time the government instituted the instant case she would have been able to force her former husband to satisfy the tax liens. The IRS, in the six-year period between the date of the assessments and the date of the filing of the present suit, was unable to locate sufficient assets owned by her former husband to satisfy the assessments and Asmar has offered no proof that she would have had any greater success. Asmar also failed to establish that, as of the time the suit was filed, the amount she could have recovered from her former husband was less than the amount she could have obtained by bringing suit earlier.[9]

---

9. Indeed, at trial Asmar and her son each testified that Robert Asmar owned assets worth mil-

lions of dollars. Her son testified that Robert Asmar owns a house in New Jersey worth $150,-

Second, in a more general sense, we cannot accept the fact that Asmar has suffered *any* demonstrable detriment. Any benefit she received from the IRS agents' promise not to proceed against her for execution of the judgment is not one to which she was or is legally entitled. To the contrary, she is jointly and severally liable for the 1976 tax judgment against her and her former husband. It would be a windfall to Asmar if she were not required to satisfy any of the adjudged tax deficiency. Moreover, strictly speaking, the IRS agents never *forgave* the adjudicated liability. They represented only that the IRS would "go after" Robert for satisfaction. There was always the possibility that, *after* fulfilling their promises and proceeding against Robert, the IRS would proceed against Kathleen Asmar for the remainder of any unsatisfied judgment.

While she may be adversely affected by the execution of the judgment, it is not clear that Asmar is worse off than if the IRS had never promised to forego an action against her. She received a benefit when the IRS did not immediately execute on the 1976 tax adjudication or enforce the 1977 property liens. Consequently, we conclude that the district court was incorrect in holding that Ms. Asmar had relied on the IRS

agents' misrepresentations to her detriment.[10]

## IV.

In view of our determination that the district court erred when it held that Kathleen Asmar had relied to her detriment on the misrepresentations of the IRS agents, we will reverse the district court's order of July 22, 1986 in favor of Asmar and direct the district court to enter judgment against Asmar in the amount of the unsatisfied tax liability.[11] Since no appeal was taken from the district court's order entering judgment against Robert Asmar and in favor of Kathleen Asmar on her indemnification claim, that portion of the district court's order will remain undisturbed.

000, certain buildings in New Jersey, property in St. Petersburg, Florida, and a cabin cruiser. Thus, as far as the record shows, Asmar's former husband has ample assets to satisfy his obligation to hold her harmless against any liens filed against the marital properties conveyed to her under the divorce agreement. This being the case, taxpayer has not suffered a detriment, i.e., the *permanent* loss of a legal right, that will support an estoppel. *Heckler v. Community Health Services,* 467 U.S. at 61–64, 104 S.Ct. at 2224–26.

10. We need not address whether Asmar's reliance was reasonable in light of our holding that Asmar did not establish detrimental reliance. We note, however, the Supreme Court's statement in *Heckler* that the general rule is "that those who deal with the Government are

expected to know the law and may not rely on the conduct of Government agents contrary to the law." *Heckler,* 467 U.S. at 63, 104 S.Ct. at 2225; *see Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) ("'Men must turn square corners when they deal with the Government.'"); *Boulez v. Commissioner of Internal Revenue,* 810 F.2d 209, 218 (D.C.Cir.1987) ("when a compromise of tax liability is at issue, the need for rigorous compliance with pertinent regulations may be at its greatest, for not only the integrity of the public fisc but also public faith in the equitable enforcement of tax laws hangs in the balance").

11. At oral argument, it was represented to the court by Asmar's counsel that the other defenses interposed in the Asmar answer would not merit remand for further proceedings.