**John COOK, et al., Plaintiffs,**

v.

**PENSION BENEFIT GUARANTEE CORPORATION, Defendant.**

**No. 80 Civ. 2558.**

United States District Court, S.D. New York.

Jan. 15, 1987.

Gerald Richman, of Shapiro, Shiff, Beilly Rosenberg & Fox, New York City, for plaintiffs.

Henry Rose, Lois Bruckner Parks, Washington, D.C., Francis Laruffa, New York City, for defendant.

WALKER, District Judge:

## INTRODUCTION

The plaintiffs, Trustees of the Local 852 General Warehouseman's Union, International Brotherhood of Teamsters Pension Fund ("Fund"), bring this suit against Defendant Pension Benefit Guarantee Corporation ("PBGC"), a wholly owned government corporation which guarantees payment of pension benefits to certain retired employees. The Trustees seek to compel PBGC to reimburse the Fund for benefits that the Fund is continuing to pay to pensioners of two closed warehouses. In a prior motion, this Court dismissed a claim that the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), the statute which established PBGC and now regulates its activities, obligated PBGC to pay these amounts. Remaining in the case, is the claim that plaintiffs are entitled to recovery based upon a theory of equitable estoppel resulting from an initial determination by the PBGC that it would guarantee benefits to the retirees of the two warehouses, that this initial determination caused the Fund to incur approximately $3,000,000 in obligations which they believed would be reimbursed by the PBGC and that PBGC must reimburse the Fund for this amount.

The defendant moves for summary judgment under Fed.R.Civ.P. Rule 56. This Court, after oral argument and a careful review of the extensive submissions by the parties, concludes that the plaintiffs may not recover on an equitable estoppel theory, unless they can show that the PBGC's conduct has amounted to affirmative misconduct, or that a decision in the defendant's favor would result in manifest injustice. Since they have made no such showing, summary judgment is appropriate.

## FACTS

### I. *The Pension Plan 1951 to 1973*

The pension fund involved in this dispute was created in 1951 by an Agreement and Declaration of Trust between the General Warehouseman's Union and a number of employers who had entered into a collective bargaining agreement with the Union. As part of their collective bargaining agreements, the employers contribute to the Fund on behalf of their employees. The Agreement provided that the Fund be administered by six Trustees—three Union Trustees and three employer Trustees.

In 1952, the Trustees adopted rules and regulations for administration of the Fund. Under these rules, benefits accrue to employees with at least 25 years of service automatically at age 65 and are payable monthly for the life of the pensioner. The benefits were not conditioned upon the amount of employer contributions and the plan explicitly provided, as it still does, that benefits to retirees shall not "in any event" be reduced. Although the plan was amended from time to time between the years 1951 and 1973, the foregoing basic rules remained unchanged.

### II. *The Short Term Amendment in 1973*

In April 1973, the Trustees amended the plan in an effort to diminish Fund liability in cases where the contributing employer, before making sufficient payments on behalf of participating employees to cover the cost to the Fund of their pensions, stops contributing on behalf of workers either because a facility has been closed down or the business has been terminated. Under this so-called Short Term or Limitation of Liability amendment, benefits were restricted for employees of any closed facility where the employer had contributed to the Fund for less than 120 months. Employers whose contributions ceased before the end of 120 months have been termed "short term employers" by the parties in this case.[1]

The Short Term amendment distinguished between employees of short term employers who had retired prior to April 1, 1973 from those retiring after that date.

---

1. The plan was amended again in 1976 to comply with ERISA. At that time the Trustees apparently discarded the Short Term limitation of liability amendment.

The amount of money in the Fund attributable to contributions by any short-term employer first was to satisfy potential liability of the Fund for payments to that employer's pre-April 1, 1973 retirees, determined on an actuarial analysis of each Fund participant's life expectancy. Only if the Fund assets exceeded those required for payments to pre-April 1, 1973 retirees would the excess then be available for that short-term employer's post-April 1, 1973 retiree payments.

## III. *ERISA and the PBGC*

In 1974, Congress enacted ERISA which, in 29 U.S.C. §§ 1301 *et seq.*, established the PBGC to provide insurance should a pension plan terminate and be unable to provide all of the payments due to plan participants. Under the statutory scheme, the PBGC picks up the obligations of the deficient plans and pays benefits to retirees. To finance these payments, the PBGC collects insurance premiums from the funds that it guarantees. When the PBGC pays money as an insurer, the employer must reimburse the PBGC up to 30 per cent of the employer's net worth. If necessary, the Fund is also authorized to borrow money from the United States Treasury. Hence, PBGC is entirely self-supporting and receives only loans from the United States Government.

## IV. *The Events*

The events giving rise to this action began in 1975 when one contributing employer to the Fund, the Great Atlantic and Pacific Tea Company ("A & P"), decided to close two of its warehouses and stop payments to the Fund on behalf of employees of those facilities. In July 1969, the A & P began contributing to the Fund for four of its warehouse facilities: Maspeth, Decatur St., Elmsford, and Garden City. In about October 1975, after making payments to the Fund for less than 120 months, A & P closed its facilities at Maspeth and Elmsford. At that time A & P had contributed about $346,000 for the benefit of Maspeth employees for whom the actuarial liability

stood at $1,598,900. A & P had contributed about $824,000 for participating employees at Elmsford. The actuarial liability for these employees was approximately $2,598,500. Thus, there was a shortfall between actuarial liability and funded contributions for both facilities of something over $3,000,000.

As of the Maspeth and Elmsford warehouse closings ERISA had been in effect for approximately one year. Since the Fund was guaranteed by the PBGC, a question arose as to whether the closings of two of the four facilities covered by the Fund triggered PBGC liability for the $3,000,000 shortfall. If, under ERISA, the Fund was deemed a single multi-employer plan, there would be no coverage by the PBGC because the plan had not terminated. If, on the other hand, that the Fund was deemed an aggregate of separate plans then the terminations of the two warehouses would constitute termination of two separate plans, each insured by the PBGC.

On December 3, 1975, Fund counsel notified the PBGC that A & P had closed the Elmsford and Maspeth facilities and raised a number of questions concerning the application of the Short Term amendment under ERISA. On December 17, 1975, Fund counsel, now deceased, advised the PBGC that in his opinion the closings of the two warehouses constituted terminations of two separate plans. He told the PBGC that the assets attributable to contributions for the various facilities were segregated until an employer had contributed for 120 months.

On January 13, 1976 a meeting was held between representatives of the Fund, A & P and PBGC. A letter from the PBGC's Director of Office Program Operations, Joseph E. Ellinger, circulated to the participants, stated: "With respect to A & P, it has been determined that each of its three (sic) warehouses is covered by a separate, single employer plan. Therefore, the closing of two warehouses and separation from employment of the employees at the two locations, constitutes two terminations...." The letter also noted that the

PBGC required a Notice of Intent to Terminate for each facility to process any guaranteed benefits owing to Fund participants. Those at the meeting discussed the Fund's operation and the management of its assets. The parties dispute both what was said at the meeting and the reasonable effect thereof on the expectations of the parties. The Trustees say that they left the meeting confident that the PBGC would guarantee the Elmsford and Maspeth plans based upon the remarks made by PBGC representatives at the meeting. The PBGC, on the other hand, asserts that PBGC's comments merely indicated that the PBGC would defer a final decision pending the receipt of more information regarding the management of fund assets. The parties agree, however, that PBGC Staff Attorney Anderson instructed the Trustees at that meeting to continue to pay benefits to the retired employees of all four facilities and to process new applications of employees eligible to receive benefits under the plan.

On January 22, 1976, the Trustees unanimously adopted a resolution disregarding the limitation of liability amendment as to the Elmsford and Maspeth closings. They proceeded to process applications and to pay full benefits to the Elmsford and Maspeth post and pre-April 1, 1973 retirees alike. The resolution cited among the reasons for this action—the determination in the letter received from the PBGC on January 13, 1976, the instructions from Staff Attorney Anderson, and supercession of the amendment allocation procedures by ERISA.

There ensued a flurry of letters between the PBGC and the Fund as they began to work out the details of the PBGC coverage of the Elmsford and Maspeth pension benefits. By letter dated March 15, 1976, William S. Heath, Chief of the PBGC's Division of Plan Review, informed Fund counsel that the PBGC required certain documents: an IRS favorable letter of determination and Notices of Intent to Terminate for the two facilities. The letter stated that, absent these documents, the PBGC would reconsider its position, "as appropri-

ate", in each instance. On March 25, 1976 Fund counsel responded that the Trustees had provided some of the information contained in the requested documents and that the Fund had applied to the IRS for a favorable letter of termination. The Fund submitted the requested Notices within one week. By letter dated April 8, 1976, the PBGC again requested the IRS letter and suggested that the PBGC's characterization of the Elmsford and Maspeth plans could require re-evaluation because IRS had not had a chance to consider the qualifications of the Plan following the 1973 amendment.

Over the next two years, both the Fund and A & P continued to supply the PBGC with documents and information as requested. In September 1977 the Fund received and forwarded to the PBGC the IRS letter of determination. In March 1978, two more PBGC letters to the Fund reiterated with some equivocation, the earlier position taken by the PBGC that the plans constituted two separate terminations, each covered by PBGC guarantees. A letter dated March 30, 1978, for example, stated that the participation in the Fund of the two closed warehouses was to be handled "for the present" as two separate terminations.

A year later, on March 19, 1979, for reasons which the parties dispute, the Trustees notified the PBGC that they planned to reinstitute the Short Term amendment and stop paying benefits to Maspeth and Elmsford retirees once employer contributions were depleted. Understandably, this provoked substantial protest from retirees. As of May 1979, the PBGC was still requesting and receiving additional information from the Fund. Finally, on May 23, 1979, the PBGC issued a new determination letter stating that the Fund constituted a single multi-employer plan rather than an aggregate of separate plans. While parties dispute the reasons underlying the change, it is not disputed that the new determination meant that the PBGC would not guarantee the benefits for the Elmsford and Maspeth retirees. The

Trustees questioned the PBGC's determination in letters dated June 7 and 28th 1979 and on August 8, 1979, the PBGC reaffirmed its May 23rd position. In June, 1979, the Trustees decided that regardless of the PBGC's decision, the Fund would continue to pay benefits to the Elmsford and Maspeth pensioners.

The Trustees commenced this suit, alleging *inter alia,* that the PBGC's 1979 determination was incorrect and that, in any case, they had relied to their detriment on the various representations made to them by the PBGC in the years 1976–78. Judge Henry Werker dismissed their Third Claim, which alleged that the PBGC's May 23, 1979 determination was incorrect under ERISA.

### V. *The PBGC's Motion for Summary Judgment*

The PBGC's now moves for summary judgment on the remaining five claims.[2] The essence of the PBGC's argument relates to the Trustees' claims that the PBGC is estopped from refusing to guarantee the Elmsford and Maspeth plans because the Fund detrimentally relied on the PBGC's early determination in deciding not to apply the Short Term amendment and limit the Fund's liability. The PBGC contends that as a federally constituted and regulated corporation it cannot be estopped from changing its rulings as it seeks to apply a federal statute unless it acts with affirma-

tive misconduct. Alternatively, the PBGC argues that plaintiffs cannot show that they reasonably, foreseeably and detrimentally relied on representations by the PBGC. Because the Court holds that the PBGC cannot be estopped by a showing of anything less than its affirmative misconduct or that a decision in its favor would be manifestly unjust, the Court grants the defendant's motion for summary judgment.

### DISCUSSION

### I. *Standard for Summary Judgment*

Under Fed.R.Civ.P. Rule 56, summary judgment is appropriate when "there is no genuine issue as to any material fact" and as a matter of law the moving party is entitled to judgment. To withstand a motion for summary judgment the non-movant must identify an issue of fact raised by more than mere speculation or conclusory allegation. Additionally, the fact must be germane to the legal dispute. *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### II. *Estoppel of a Federal Agency or Body*

The Supreme Court has yet to adopt a definitive rule identifying the circumstances in which the government may be estopped from enforcing its regulations against a private litigant. *See, Heckler v. Community Health Services,* 467 U.S. 51,

---

**2.** The remaining claims include: the First Claim, alleging that the Trustees relied on the representations of the PBGC to the detriment of the Fund because, absent these representations, they would have adhered to the Short Term amendment and relieved the Fund of liability for approximately $3,000,000; the Second Claim, alleging that the PBGC is depriving Fund participants of insurance benefits to which they are entitled as third party beneficiaries to the pension benefit guarantee insurance contract between the PBGC and the Fund; the Fourth Claim alleging that the PBGC has treated other, similar plans, differently from this one; the Fifth Claim that by accepting its statutory responsibility for guaranteeing the pension benefits of the Elmsford and Maspeth warehouses the PBGC became a constructive trustee of the pension benefits due those employees and breached those duties when it refused to guar-

antee the benefits; and finally the Sixth Claim which alleges that by refusing to guarantee the benefits due the Maspeth and Elmsford participants, the PBGC was requiring the remaining employers contributing to the Fund to pay more than their contractual share of pension benefits and that this contravenes Constitution of the United States. In this motion for summary judgment, the PBGC addressed all but the First Claim, alleging that the government is estopped, in a footnote. In their affidavits and Memorandum of Law in opposition to the defendant's motion the Trustees have not opposed the defendant's position on any issue but that of estoppel. As the Court has decided that no issues of fact exist on the estoppel issue and as the plaintiff has failed to contest the defendant's position or indicate any issue of fact on the remaining claims Court here grants summary judgment for the defendant on all claims.

104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Nor has the Court of Appeals for the Second Circuit developed a conclusive standard. Both Courts, however, have considered the issue and, following a careful review of these cases, this Court is of the view that in order to raise an estoppel against the government the private litigant must demonstrate that the government has engaged in "affirmative misconduct" or that a decision in the government's favor would work a manifest injustice.

In *Schweiker v. Hanson*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1980) (per curiam), for example, the Court agreed with dissenting Judge Friendly's opinion that the government may require a written application before dispensing "mother's insurance benefits" in a case where plaintiff, in reasonable reliance upon a government agent's erroneous representation that she was ineligible, failed to submit the written application. The Court cited both lack of affirmative misconduct by the government agent and the Court's unwillingness to burden the public fisc where Congress had decreed specific requirements for the payment of the funds. Judge Friendly, in his dissent from the Second Circuit Court of Appeals opinion in that case, reviewed all the relevant Supreme Court and Second Circuit opinions. Based on that review, he concluded that governmental misconduct was required to establish an estoppel against the enforcement of valid regulation and that the plaintiff could not recover the benefits at issue where no affirmative misconduct before it had been demonstrated. *Hansen v. Harris*, 619 F.2d 942 (2d Cir. 1980) (Friendly, J., dissenting). *See also, Federal Crop Insurance Corp. v. Merille*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (Government was not estopped from refusing to pay crop insurance benefits to plaintiffs even though they had relied to their detriment on government agent's advice that if they planted their crop on reseeded winter wheat acreage it was insurable.); *Heckler*, 467 U.S. at 58, 104 S.Ct. at 2223 ("Government may not be estopped on the same terms as any other litigant").

In *Corniel-Rodriguez v. I.N.S.*, 532 F.2d 301, 306 (2d Cir.1976) the Court of Appeals for the Second Circuit held that the government had acted improperly in failing to follow a rule mandating written notice of certain regulations to aliens applying for entry visas and concluded that, in such circumstances, the government was precluded from deporting an alien who had inadvertently entered the country in violation of those regulations. The Court found that a decision in defendant's favor would have worked a "manifest and gross injustice." The court remarked that it was certain Congress would have approved of the State Department regulations intended to protect aliens from the consequences of their ignorance of the complicated United States immigration laws. The court, therefore, considered its opinion to be in accordance with Congressional intent, stating that "we are equally certain that Congress would not have wished the government's flouting of these regulations to occasion the banishment of a hapless alien from our shores." *Corniel-Rodriguez*, 532 F.2d at 306.

In other cases, however, where it found no government misconduct, the same Court of Appeals refused to apply the doctrine of estoppel against the government. *See, Goldberg v. Weinberger*, 546 F.2d 477 (2d Cir.1976) (Government not estopped from denying plaintiff widow's benefits when she married before the age of 60 in reliance on mistaken representations of government agent that her widow's benefits would not terminate); *U.S. v. RePass*, 688 F.2d 154, 158 (2d Cir.1982) (equitable estoppel not available against the Government "except in the most serious of circumstances.")

The Court's holding is further supported by the decisions of other federal courts of appeals that have required affirmative misconduct on the part of government agents before a government agency can be estopped. *See, Lovell Mfg. v. Export-Import Bank of the United States*, 777 F.2d 894 (3rd Cir.1985); *Sweeten v. United States Dept. of Agriculture Forest Service*, 684 F.2d 679, 682 (10th Cir.1982) ("We agree with the Ninth Circuit, however, that in

addition to establishing the traditional elements of estoppel, the appellants must also show affirmative misconduct by the government or its agents to establish estoppel against the government in an action concerning boundaries of land granted in a federal land patent").

 Taking the facts in the light most favorable to the plaintiffs, the Court finds no evidence of any affirmative misconduct on the part of PBGC or that a decision in the PBGC's favor would work a manifest or gross injustice. The PBGC made an initial erroneous determination based on information then available and working with a newly enacted statute. It conditioned the determination on the receipt of Notices of Intent to Terminate and a favorable Letter of Determination from the IRS, that the Maspeth and Elmsford plans were guaranteed by PBGC. The PBGC then requested additional documents from the Trustees over a period of three years. Finally, after evaluating these documents and reconsidering the requirements of ERISA, the PBGC altered its original decision in an effort to conform more closely with the intent of Congress.

A good faith, albeit erroneous, decision is not equivalent to affirmative misconduct. Nor can the Court find affirmative misconduct in the PBGC's continued efforts to interpret ERISA in light of the influx of documents it received from the plaintiffs. This is not a case in which a naive plaintiff has been misled by an official who has ignored mandatory regulations. *See, Corniel-Rodriguez*, 532 F.2d 301. There is no showing here that the Trustees and their attorneys were other than sophisticated pension fund experts and administrators such as would lead to a "manifest or gross injustice." Although, PBGC's initial opinion letter could have been couched in less affirmative terms, the Court cannot hold that the PBGC is precluded by the doctrine of estoppel from altering its original view as it works to conform its decisions to Congressional intent.

## CONCLUSION

The Court must hesitate to apply the doctrine of estoppel against the government when, as in this case, it would circumvent the intent of Congress. The PBGC has determined, and Judge Werker has upheld its determination, that Congress did not intend to guarantee benefits for the Maspeth and Elmsford warehouses. Moreover, there is no evidence that the PBGC engaged in affirmative misconduct in its dealings with the Trustees or that a decision in the PBGC's would work a manifest or gross injustice. Accordingly, application of the doctrine of equitable estoppel is inappropriate in this case. The defendant's motion for summary judgment is hereby granted.

SO ORDERED.