**PENSION BENEFIT GUARANTY CORP., Plaintiff,**

v.

**WHITE CONSOLIDATED INDUSTRIES INC., Defendant.**

No. 91–1630.

United States District Court, W.D. Pennsylvania.

Aug. 24, 1999.

Anthony J. Basinski, Reed, Smith, Shaw & McClay, Pittsburgh, PA, Bruce H. James, Pension Benefit Guaranty Corp., Washington, DC, George R. Clark, John R. Erickson, Kathleen H. McGuan, Tamara V. Scoville, Pamela K. Riley, Mary E. Riordan, David Ober, Reed, Smith, Shaw & McClay, Washington, DC, for plaintiff.

Edwin L. Klett, Kleet, Lieber, Rooney & Schorling, Pittsburgh, PA, William McGuinness, Janice M. Mac Avoy, Stephen J. Obie, Alexander R. Sussman, Charles King, Rana Dershowitz, Andrew T. Gardnerf, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant.

Paul Meyer, Office of the General Counsel, Washington, DC, for Wyatt Co., other party.

Richard Gurbst, Squire, Sanders & Dempsey, Cleveland, OH, for Squire, Sanders & Dempsey, other party.

### MEMORANDUM OPINION

CINDRICH, District Judge.

This action arises from the financial collapse of several pension plans (the "BK

Plans") which were at all times covered by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1301 *et seq.* Plaintiff, the Pension Benefit Guaranty Corporation ("PBGC"), the statutory guarantor of the BK Plans, filed a five count amended complaint against defendant White Consolidated Industries, Inc. ("WCI") seeking to recover unfunded benefit liabilities pursuant to various applications of 29 U.S.C. Sections 1362 and 1369. WCI had previously transferred the BK Plans, along with a group of associated businesses, to Blaw Knox Corporation ("BKC"); thus, WCI was not the contributing sponsor of record at the time of the BK Plans' termination.

Judge McCune of the United States District Court for the Western District of Pennsylvania dismissed the complaint in its entirety pursuant to a motion to dismiss filed by WCI. The United States Court of Appeals for the Third Circuit later affirmed in part and reversed in part Judge McCune's decision, concluding that PBGC had stated viable claims at Counts One and Four of the amended complaint. *Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.,* 998 F.2d 1192 (3d Cir.1993) (*"PBGC v. WCI"*). Count One charges that WCI is liable for the unfunded pension liabilities pursuant to 29 U.S.C. Section 1362 ("Section 1362") because the WCI–BKC sale transaction was a "sham," having no legitimate business purpose or economic effect. Count Four charges that WCI is also liable for the unfunded pension liabilities pursuant to 29 U.S.C. Section 1369 ("Section 1369") because a principal purpose of WCI's decision to consummate the WCI–BKC sale transaction was to evade pension liabilities. The court remanded the case to the district court for further proceedings on these counts.

PBGC filed a motion for summary judgment prior to trial seeking judgment in its favor on a counterclaim in recoupment asserted by WCI. PBGC also moved to strike several estoppel defenses asserted by WCI as affirmative defenses. The court reviewed the parties' briefs and related submissions and heard oral argument on both motions. The court issued a ruling from the bench granting both motions and informed the parties that a written opinion would be issued. 3/12/97 Trans. (Doc. No. 193) at pp. 139–67. Following is the opinion which more fully explains the basis for the court's ruling.

I. *Standard of Decision*

Summary judgment is mandated where the pleadings and evidence on file show there is no genuine dispute of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue does not arise unless the evidence, viewed in the light most favorable to the non-moving party, would allow a reasonable jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material when it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. 2505. In reviewing any facts alleged to create a genuine issue, if the court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,' " and summary judgment must be granted. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

II. *Analysis*

WCI filed an amended counterclaim asserting a cause of action for recoupment which seeks a reduction in any recovery PBGC may have. WCI alleges that PBGC fraudulently or negligently led WCI to be-

lieve that it was not necessary to terminate the BK Plans and that no further action was necessary which prevented WCI from taking actions to prevent or minimize the amount of the BK Plans' unfunded liabilities. Amended Answer And Counterclaim ("Am.Answer") (Doc. No. 39) at p. 17. More specifically, WCI maintains that it could have exercised its rights under the WCI–BKC sales agreement and its mortgage and other security interests, including the right to foreclose on the assets of BKC, and taken other actions to prevent or minimize any further increase in the BK Plans' unfunded liabilities or diminution of BKC's assets were it not for PBGC's misrepresentations.

Similarly, WCI's Third, Fifth, and Sixth affirmative defenses are equitable estoppel defenses which are based on the same alleged PBGC misrepresentations which it cites in support of its counterclaim in recoupment. Specifically, the Third affirmative defense asserts that PBGC's claims are barred by the doctrines of equitable estoppel, waiver and laches due to PBGC's affirmative misconduct of making intentional, fraudulent misrepresentations to WCI. *Id.* at 8. The Fifth affirmative defense asserts that PBGC's claims are barred because of its fraudulent and inequitable conduct toward WCI. *Id.* The Sixth affirmative defense asserts that PBGC's claims are barred because senior PBGC officials negligently supervised the officials responsible for processing and taking administrative action on the Notice of Reportable Event as it applied to the WCI–BKC sale. *Id.*

PBGC makes several arguments in support of its motions which we address in turn.

### 1) *Essential Elements of Recoupment Claim and Estoppel Defense*
#### *i) Recoupment Claim*

■ "Recoupment is a common law, equitable doctrine that permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by a plaintiff." *United States v. Keystone Sanitation Co., Inc.,* 867 F.Supp. 275, 282 (M.D.Pa.1994). A recoupment claim may be based on any type of claim so long as it (1) arises from the same transaction or occurrence as the plaintiff's suit; (2) seeks relief of the same kind or nature; and (3) seeks an amount not in excess of the plaintiff's claim. *F.D.I.C. v. Hulsey,* 22 F.3d 1472, 1487 (10th Cir.1994); *Livera v. First Nat. State Bank of New Jersey,* 879 F.2d 1186, 1195–96 (3d Cir.1989); *Keystone,* 867 F.Supp. at 282.

WCI's counterclaim in recoupment is based upon alleged negligent and fraudulent misrepresentation. In Pennsylvania, the tort of negligent misrepresentation is defined as:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Browne v. Maxfield,* 663 F.Supp. 1193, 1202 (E.D.Pa.1987) (quotation and citation omitted). False information may be supplied "either directly or indirectly, by nondisclosure of material facts." *Id.* (citation omitted).

■ "To prove fraudulent misrepresentation a plaintiff must prove (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient on the misrepresentation and (5) damage to the recipient as the proximate result." *Id.* (quotation omitted). A false representation is fraudulent when it is made "knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false." *Id.* (quotation omitted). Also, a fraudulent representation

must be proved by clear and convincing evidence, as opposed to the lower preponderance of the evidence standard. *Id.*

Thus, "the elements that negligent and fraudulent misrepresentation have in common are false information, justifiable reliance, causation, and pecuniary loss. The distinguishing elements are the state of mind of the person who supplied the information and the standard of proof that must be met by the plaintiff." *Id.*

### ii) Estoppel Defense

■ To succeed on a traditional estoppel defense, a defendant must prove (1) a misrepresentation by the plaintiff; (2) which he or she reasonably relied upon; (3) to his or her detriment. *United States v. Asmar,* 827 F.2d 907, 912 (3d Cir.1987). A pivotal issue is whether PBGC is a government entity which we address *infra.* Although the Supreme Court has suggested in dicta on several occasions that there might be some situation where estoppel against the government could be appropriate, the Court has never decided the issue and "has reversed every finding of estoppel that [it] has reviewed." *Office of Personnel Management v. Richmond,* 496 U.S. 414, 421–22, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). In *Richmond,* a more recent case in which it has addressed the issue, the Court stopped just short of holding that estoppel can never be asserted against the government. The Court held that,

> [w]hether there are any extreme circumstances that might support estoppel in a case not involving payment from the Treasury is a matter we need not address. As for monetary claims, it is enough to say that this Court has never upheld an assertion of estoppel against the Government by a claimant seeking public funds. In this context there can be no estoppel, for the courts cannot estop the Constitution.

*Id.* at 434, 110 S.Ct. 2465. While we believe the Supreme Court's treatment leads to only one conclusion, the Third Circuit

has held otherwise and found that estoppel may be asserted as an equitable defense against a government claim if a defendant satisfies the additional burden of establishing "some affirmative misconduct on the part of the government officials." *Asmar,* 827 F.2d at 911 n. 4; *see also United States v. Pepperman,* 976 F.2d 123, 131 (3d Cir.1992).

### iii) Recoupment Claim v. Estoppel Defense

A comparison of the essential elements of a recoupment claim based on negligent and fraudulent misrepresentation and an estoppel defense reveals that they all have three essential elements in common, (1) a misrepresentation; (2) which was justifiably relied upon; (3) to one's detriment. The claim and defense are different in that one has the additional burden of proving affirmative misconduct to succeed on an estoppel defense against the government.

### 2) WCI's Statement of Facts

PBGC argues that the counterclaim and estoppel defenses must fail because WCI cannot satisfy at least two of the essential elements common to each, a misrepresentation and justifiable reliance. PBGC argues further that it is the government for estoppel purposes and therefore WCI must show that PBGC engaged in affirmative misconduct to succeed on its estoppel defenses. PBGC contends that even if WCI's allegations were true, its actions do not rise to the level of affirmative misconduct.

WCI argues in response that there is more than sufficient evidence to support its recoupment claim and estoppel defenses. WCI further maintains that PBGC is not the government, therefore, it is not required to prove affirmative misconduct to succeed on its estoppel defense. WCI contends that in any event, the evidence supports a finding of affirmative miscon-

duct.[1]

WCI describes the evidence which allegedly supports its recoupment claim and estoppel defenses as follows. On October 25, 1985, WCI and BKC filed with PBGC a reportable event notice informing PBGC of the transfer of sponsorship of the BK Plans from WCI to BKC.[2] Appendix To WCI's Response To PBGC's Motion For Summary Judgment ("WCI App.") (Doc. No. 138) at PBGC Ex. 811. After reviewing the reportable event filing, William DeHarde ("DeHarde"), Director of PBGC's Insurance Operations Department, issued a memo to Edward Mackiewicz ("Mackiewicz"), PBGC's General Counsel, expressing concern over BKC's ability to assume the liabilities associated with the BK Plans. WCI App. at McCulloch Dep. Ex. 1. DeHarde requested Mackiewicz "to evaluate the legal implications of the transaction and provide the legal assistance necessary in resolving this issue." WCI App. at McCulloch Dep.Ex. 1.

Mackiewicz assigned PBGC in-house counsel Frank McCulloch ("McCulloch") to review the WCI–BKC sale transaction. Shortly thereafter, on December 31, 1985, McCulloch telephoned Carl Draucker ("Draucker"), an associate at Squire, Sanders, & Dempsey ("SS & D"), WCI's outside counsel, and informed him that "pa-perwork to involuntarily terminate the [BK] Plans had just reached his desk" and that the PBGC "division responsible for reviewing the Notice of Reportable Event had recommended such action since the transaction on its face indicates that [WCI] structured the transaction as a sham to rid itself of pension liabilities." WCI App. at McCulloch Dep.Ex. 3. Immediately thereafter, Draucker reported the conversation to Daniel R. Elliot, Jr. ("Elliot"), Senior Vice President–Law, General Counsel and Secretary of WCI; William H. Ransom ("Ransom"), lead pension counsel from SS & D during the WCI–BKC transaction; and James Ollinger ("Ollinger"), a BKC representative. *Id.*

On January 22, 1986, McCulloch went to SS & D's offices to review the WCI–BKC sales agreement. WCI App. at McCulloch Dep. pp. 45–47. After reviewing the agreement, McCulloch met with Elliot, Ransom, and Ollinger. WCI App. at McCulloch Dep.Ex. 5. McCulloch stated during the meeting that PBGC "could inform White that as a result of the transaction it was still in its view on the hook for the liabilities under the plans that were now sponsored by [BKC]; it could move to involuntarily terminate the plans; or it could do nothing." WCI App. at McCulloch Dep. p. 53. Ransom and Elliot con-

---

**1.** WCI devotes a substantial part of its brief arguing that PBGC's motion for summary judgment should be denied based on Judge McCune's ruling on PBGC's previously filed motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Judge McCune ruled that WCI had successfully stated a claim for recoupment. Now that the parties are at the summary judgment stage, however, WCI must present evidence that supports its claim. WCI's lack of understanding of Fed.R.Civ.P. 56 is also exhibited by its repeated contention that PBGC's motion for summary judgment should be denied because PBGC has failed to disprove an essential element of WCI's claim. PBGC's motion for summary judgment calls into question the essential elements of WCI's counterclaim. Rule 56 requires WCI to present evidence of specific facts sufficient to create a genuine dispute of material fact on the existence of the essential elements of its claim. *See Lujan v. National Wildlife Federa-*

*tion,* 497 U.S. 871, 887, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("Rule 56(e) provides that judgment 'shall be entered' against the non-moving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.' " *The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.* (Citations omitted and emphasis added)).

**2.** Pursuant to 29 U.S.C. Section 1343(b)(13), plan administrators and sponsors must notify PBGC when certain specified events occur "that may be indicative of a need to terminate the plan." Pursuant to 29 C.F.R. Section 4043.29, a plan administrator is also required to notify PBGC if there has been a change in the sponsor of his or her plan. These occurrences are commonly referred to as reportable events.

tend that McCulloch also stated or implied that in his view the transaction was bona fide and that he would report his conclusion to other PBGC officials. WCI App. at Ransom Dep. pp. 261–63; Elliot Dep. pp. 466–68.

In an internal memo dated March 28, 1986, Mackiewicz and McCulloch reported to DeHarde that: "We cannot conclude on the basis of the information available to us to date that the WCI–BK[C] transaction should be viewed as an abusive, strong-seller/weak-buyer situation. We would ask you to evaluate the financial commitments made by the parties ... to determine ... whether or not PBGC's funds are being subjected to an unreasonable risk." WCI App. at Barton Dep.Ex. 10, p. 4.

PBGC's review of the WCI–BKC transaction continued as PBGC Section Head Alta Underwood ("Underwood") and PBGC Case Officer Mary Hogan ("Hogan") reported to PBGC Branch Chief Jesse Paredes, in an internal memo dated August 7, 1986, that WCI had "acted responsibly in structuring the Sale Agreement with Blaw–Knox Corporation." WCI App. at Barton Dep.Ex. 12, p. 2. On August 11, 1986, Paredes sent PBGC analyst Robert Klein ("Klein") a memo requesting him to review WCI's reportable event filing. WCI App. at McCulloch Dep.Ex. 13. Paredes instructed Klein to

> Please review the attached material and case file and advise me of the degree of risk exposed to PBGC if the insufficient plans are terminated by the newly formed buyer-corporation.
>
> In your analysis, include suggested alternatives under which PBGC can reduce its exposure, such as obtaining a written commitment from the seller to make up the insufficiency if the plans

are terminated within a number of years.

WCI App. at McCulloch Dep.Ex. 13.

On December 10, 1986, BKC filed a reportable event notice concerning a planned shutdown of one of the BK businesses. Klein reviewed the materials submitted by BKC and spoke with BKC Vice President/Secretary/Treasurer Richard McIntyre ("McIntyre"). WCI App. at McCulloch Dep.Ex. 17. In a memo to PBGC's BKC file dated March 23, 1987, Klein stated that "a high priority should be given to action before June 30, 1987," when the letter of credit begins to be released at a rate of $3 million per year. WCI App. at McCulloch Dep.Ex. 17. Klein also stated, "As I see it, there are two viable courses of action available: involuntary termination ... or a workout with [BKC] to reduce PBGC exposure to acceptable levels commensurate with [BKC's] creditworthiness. Each alternative poses risks; I cannot determine at this time which is preferable." WCI App. at McCulloch Dep.Ex. 17. Klein also reported that he needed a legal opinion as to WCI's potential legal liability and that he had asked McIntyre to "prepare an economic justification for [BKC's] continuing sponsorship of the pension plans beyond the point at which the WCI support payments cease." WCI App. at McCulloch Dep.Ex. 17. Klein noted that "[McIntyre] is aware that I have a problem justifying the existing arrangements based on the materials he submitted." WCI App. at McCulloch Dep.Ex. 17. Two months later, in May 1987, Klein met with BKC executives and indicated that PBGC might immediately terminate the BK Plans if BKC did not take appropriate action to satisfy PBGC's concerns. WCI App. at Klein Dep. p. 145.

Shortly thereafter, Klein issued a memo to PBGC's SEPPAA Committee[3] dated

---

**3.** SEPPAA stands for Single Employer Pension Plan Amendments Act. PBGC's SEPPAA Committee was comprised of PBGC officials who were responsible for implementing certain aspects of SEPPAA, including reviewing and making recommendations on whether to terminate underfunded plans. WCI App. at Joy Dep. p. 31.

June 24, 1987 advising that "PBGC's options now are to do nothing or to move for involuntary termination based on the long-run loss. If we move for involuntary termination, we then have the option of attempting to recover any shortfall in plan insufficiency from WCI." WCI App. at Barton Dep.Ex. 11 p. 2743. Klein concludes, "Whether or not to act now is, in my opinion, a close decision. I am not making a formal recommendation either way." WCI App. at Barton Dep.Ex. 11 p. 2744.

The SEPPAA Committee met on June 29, 1987 to consider whether the BK Plans should be terminated. Klein's June 24, 1987 memo was discussed and McCulloch "reviewed the conditions of sale ... and suggested that there is a low probability of winning any litigation against WCI for employer liability." WCI App. at McCulloch Dep.Ex. 22. p. 3. Two of the SEPPAA Committee members stated that the likelihood of success in litigation could factor into its deliberations as to whether to terminate a plan. WCI App. at Dinkins Dep. pp. 96–98; Joy Dep. pp. 58–59. The SEPPAA Committee ultimately made a recommendation not to pursue an involuntary termination.

On July 22, 1987, PBGC case officer Richard Holbrook ("Holbrook") sent Draucker a letter in response to WCI's 1985 reportable event filing (the "no action letter") which stated that PBGC had "completed a review of the reportable event and determined that the notice was properly filed pursuant to 29 C.F.R. Part 2615, and your notice is accepted as filed. As a result of our review of the information you submitted, we have also determined that no further action is necessary." WCI App. at McCulloch Dep.Ex. 26.

Shortly thereafter, Draucker telephoned Holbrook to discuss the no action letter. WCI App. at Draucker Dep. pp. 341–42. In a memo to his file documenting the conversation, Draucker stated that:

Based upon the PBGC's analysis of the information supplied by WCI and Blaw

Knox Corporation to the PBGC, the PBGC has "closed out" this matter. According to Mr. Holbrook, this means that the chances are "slim-to-none" that the PBGC will assert any liability against WCI at any time in the future. Although this is not an absolute irrevocable commitment, according to Mr. Holbrook it is the furthest the PBGC ever goes in providing assurances to employers concerning potential liability in this type of situation. Mr. Holbrook stated that the reason the PBGC does not issue irrevocable letters is simply that it is the PBGC's policy not to permanently "close the door" should "something" happen in this type of situation within the five year period following the transaction. Nevertheless, in closing our conversation, Mr. Holbrook again reassured me that as far as the PBGC is concerned, the sale of Blaw Knox was (as far as the PBGC could determine based upon the information provided and reviewed) a "bona fide" business transaction and that I would be "safe" in advising WCI that they should not expect to hear from the PBGC in the future concerning liability with respect to the assumed plans.

WCI App. at PBGC Ex. 129.

### i) misrepresentation

As to the misrepresentation element, WCI contends that PBGC explicitly and/or impliedly informed WCI in 1986 and again in 1987 that it would not pursue WCI for the BK Plans' underfunding although the agency had either already decided to impose liability on WCI or knew there was a material risk that it would eventually impose liability on WCI.

First, WCI has cited no evidence which would indicate that PBGC had already decided in 1986 or 1987 to pursue WCI then or in the future for the BK Plans' underfunding. To the contrary, the evidence cited by WCI clearly shows that PBGC had made an affirmative decision at that time not to pursue WCI.

WCI's contention that PBGC knew there was a material risk that it would eventually impose liability on WCI but made explicit and/or implicit representations to the contrary, is equally unavailing. Again, contrary to WCI's contention, WCI's evidence establishes that at the time, PBGC thought that there was a low probability of successfully recovering from WCI.

The facts as cited by WCI reveal an agency performing its statutory duty. Faced with a change in plan sponsors, PBGC was obligated to evaluate the WCI–BKC transaction and assess the financial security of the BK Plans. Based on the information it reviewed at that time, the agency decided not to initiate termination proceedings. There is no evidence that PBGC determined that there was a material risk that it would seek recovery from WCI sometime in the future.

Even assuming that there were evidence that PBGC considered it a possibility that it would later pursue WCI for the BK Plans' unfunded liabilities, WCI's contention that the agency was somehow obligated to apprise WCI of such risk strains credulity. PBGC's duties and responsibilities do not include assessing termination risk for employers. Indeed, PBGC is not required to make termination decisions with the goal of limiting an employer's liability. ERISA requires that involuntary termination decisions be made to protect the interests of participants, the plan at issue, and PBGC, not the interest of employers. *See* 29 U.S.C. Section 1342(c); *see also, In re Pension Plan for Employees of Broadway Maintenance Corp.*, 707 F.2d 647, 653 (2d Cir.1983) ("As the Third Circuit has repeatedly emphasized, the financial interests of the employer should play no role in setting a termination date in these proceedings."); *In re Syntex Fabrics, Inc. Pension Plan*, 698 F.2d 199, 204 (3d Cir.1983) (When setting a plan termination date, "further[ing] the interests of the employer [is] a concern which is conspicuously absent from the statute.");

*PBGC v. Valley–Vulcan Mold Co.*, 1993 WL 476158 (W.D.Pa. July 8, 1993) ("[A]n employer's potential liability or its interests, unlike those of participants and the PBGC, is not a relevant consideration" in setting a termination date.)

In sum, we find based on our review of the evidence and considering it in a light most favorable to WCI as the non-moving party, that no rational trier of fact could find that PBGC made misrepresentations to WCI.

### ii) Justifiable Reliance

As to the justifiable reliance element, we find that WCI could not have reasonably believed that PBGC was absolving it of liability in connection with the BK Plans. WCI claims that it was misled by (1) McCulloch's comments at the January 1986 meeting; (2) Holbrook's July 1987 close-out letter; and (3) Holbrook's comments during his telephone conversation with Draucker.

WCI could not have justifiably relied on the comments by McCulloch. According to WCI's rendition of McCulloch's conversation, McCulloch merely pointed out PBGC's alternative courses of action. Although WCI contends that McCulloch went on to state or imply that in his opinion the WCI–BKC transaction was bona fide, such statement or implication was not given under circumstances that would have reasonably induced reliance. McCulloch's alleged representations were verbal and made during the initial review of the WCI–BKC sales agreement. Moreover, McCulloch merely stated that he would report his conclusion to other PBGC officials. *See Heckler v. Community Health Services of Crawford County*, 467 U.S. 51, 64, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (agency cannot "be expected to ensure that every bit of informal advice given by its agents" will justify action; and "appropriateness of respondent's reliance is further undermined because the advice it received ... was oral.") Indeed, WCI representatives Elliot and Ransom testified that they un-

derstood that McCulloch's statements were not binding upon PBGC. WCI App. at Ransom Dep. p. 263 and Elliot Dep. p. 468.

Likewise, WCI could not have justifiably relied on Holbrook's July 1987 "no-action" letter to conclude that PBGC was absolving it of liability. The letter does not address the issue of WCI's potential liability or PBGC's intentions with regard to the same. *See e.g., Bachner v. Commissioner of IRS,* 81 F.3d 1274 (3d Cir.1996) (Court rejected claim of estoppel against the government on the basis of IRS letter which read: "Based on the information you have provided, the account specified above is resolved. We may contact you in the future if further issues arise requiring clarification. At present, no further response is needed on the above account.")

As to Holbrook's statements, again, such statements were not given under circumstances that would have reasonably induced reliance. Holbrook's statements were not issued in the form of a formal agency position, but were oral comments made during a telephone conversation initiated by WCI counsel Draucker. Furthermore, according to Draucker, Holbrook stated that the no action letter was not an absolute irrevocable commitment by PBGC concerning WCI's potential liability because it is PBGC policy not to permanently close the door should something happen in the future.

In sum, we find based on our review of the evidence and considering it in a light most favorable to WCI as the non-moving party, that no rational trier of fact could find that PBGC made misrepresentations to WCI. WCI will not be allowed to shift the risk of its transaction to PBGC based on the no-action letter and the few snippets from conversations between counsel for PBGC and WCI.

### iii) Affirmative Misconduct PBGC's status for estoppel purposes

■ The first issue we address is whether PBGC is the government for purposes of estoppel, which would require WCI to prove that PBGC engaged in affirmative misconduct to succeed on its estoppel defenses. The parties have cited no cases[4], nor have we uncovered any, in which a court has addressed the issue of whether PBGC is the government for estoppel purposes. Courts that have addressed the issue as to other entities, however, have concluded that the determination of "[w]hether an entity is governmental for purposes of estoppel does not turn on its label, such as agency, instrumentality, or private corporation, but rather on congressional intent." *REW Enterprises, Inc. v. Premier Bank, N.A.,* 49 F.3d 163, 167 (5th Cir.1995) (citing to *McCauley v. Thygerson,* 732 F.2d 978, 982 (D.C.Cir.1984)).

4. Both PBGC and WCI claim that other courts have ruled on this issue. None of the cases they cite, however, are on point. PBGC cites *Cook v. Pension Ben. Guarantee Corp.,* 652 F.Supp. 1085 (S.D.N.Y.1987) in which the court held that "the PBGC cannot be estopped by a showing of anything less than its affirmative misconduct or that a decision in its favor would be manifestly unjust...." However, the court proceeded on this assumption never addressing the specific issue of whether the PBGC was the government for estoppel purposes. Similarly, WCI cites to *In re Art Metal, U.S.A., Inc.,* 109 B.R. 74 (Bkrtcy. D.N.J.1989); *In re HAL, Inc.,* 196 B.R. 159 (9th Cir.BAP 1996); *Pima Financial Serv. Corp. v. Intermountain Home Systems, Inc.,* 786 F.Supp. 1551 (D.Colo.1992), all of which

are distinguishable from the facts of the instant case. *Art Metal* and *HAL* involved the concept of setoff under the Bankruptcy Code when governmental entities are involved; namely, whether two or more federal agencies should be treated as one entity for purposes of offsetting an amount the debtor owes to one of them from the amount the other agency owes to the debtor. In *Art Metal,* for example, the court ruled that amounts the debtor owed to PBGC for termination liability could not be set off or deducted from an amount the debtor was owed by the U.S. Postal Service, because PBGC's funds are separate from the general Treasury funds. As to *Pima,* the court in that case addressed the status of the FDIC for purposes of the Eleventh Amendment and the Tax Injunction Act.

PBGC has the characteristics of a government entity. For example, PBGC was created by Congress as a nonprofit corporation within the Department of Labor, 29 U.S.C. Section 1302(a); its board of directors consists of the Secretary of Labor, the Secretary of Treasury, and the Secretary of Commerce with the Secretary of Labor serving as the chairperson, *id.* at Section 1302(d); Congress delegated to it the power to promulgate regulations necessary to carry out its statutory mandate, *id.* at Section 1302(b); it is exempt from federal and state taxes, *id.* at Section 1302(g); and its total receipts and disbursements must be included in the totals of the budget of the United States Government, *Id.* at Section 1302(g). Congress also treats PBGC as a governmental agency in other statutes. For example, Section 1303(d) states that "[i]n order to avoid unnecessary expense and duplication of functions among government agencies, the [PBGC] may make such arrangements or agreements for cooperation or mutual assistance in the performance of its functions under this subchapter as is practicable and consistent with the law." (Emphasis added).

In addition, PBGC is a "government corporation," 5 U.S.C. Section 103, which 5 U.S.C. Section 105 defines as an "Executive agency" for federal employment purposes. Because of its inclusion in Section 105, PBGC is subject to the nondiscrimination and affirmative action statutes governing federal employment. *See* 42 U.S.C. Section 2000e–16 (Title VII); 38 U.S.C. Sections 4211(5) and 4214 (Veterans Readjustment Act of 1974); 29 U.S.C. Section 633(a) (Age Discrimination in Employment Act). These are the same characteristics that the court in *McCauley* considered in its determination that the Federal Home Loan Mortgage Corporation is the government for estoppel purposes. 732 F.2d at 981.

Moreover, PBGC was created by Congress to (1) encourage the continuation and maintenance of private pension plans for the benefit of plan participants; (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries in the event of termination; and (3) to maintain premiums, which are mandatory for any sponsor of a defined benefit plan, at the lowest level consistent with carrying out its obligations under the statute. 29 U.S.C. § 1302(a). To accomplish these goals, PBGC was given the power to sue and recover from sponsors of failed plans. *Id.* at § 1302(b). Any recovery obtained by PBGC reduces the burden on the insurance funds and in turn reduces the likelihood of increased premiums. Furthermore, PBGC has a responsibility to maintain the integrity of the funds for the benefit of the entire population of participants in defined benefit plans governed by ERISA. Thus, to estop PBGC from attempting to recoup the funds at issue in the instant case, absent a showing of affirmative misconduct, would thwart Congress' intended purpose of providing protection to plan participants at the lowest possible cost.

WCI also argues that it should not have to prove affirmative misconduct in this case because PBGC's actions in this case have no affect on the public fisc, i.e. the Federal Treasury. We disagree.

The case of *Fredericks v. Commissioner of Internal Revenue*, 126 F.3d 433 (3d Cir.1997), which was issued after our ruling granting PBGC's motion to strike, provides further support for the our ruling that an estoppel defense cannot be asserted against PBGC in this case. In *Fredericks*, the United States Court of Appeals for the Third Circuit recognized its previously established rule that estoppel could be asserted against the government upon a showing of affirmative misconduct by government officials. The Court stated that requiring a showing of affirmative misconduct "reflects the need to balance both the public interest in ensuring [that the] government can enforce the law without fearing estoppel and citizens' interests 'in some minimum standard of decency, honor, and

reliability in their relations with their Government.'" *Id.* at 438 (quoting *Asmar*, 827 F.2d at 912). The Court then addressed the issue of whether the Internal Revenue Service ("IRS") had engaged in affirmative misconduct. After a detailed analysis, the Court found that the IRS was guilty of such conduct and proceeded to find that all of the traditional elements of an estoppel defense had also been established.

At this point, after a finding on all of the essential elements, the Court stated that the following additional factors that should be considered before an estoppel defense against the government should be allowed to succeed: 1) the impact of the estoppel on the public fisc; 2) whether the government agent or agents who made the misrepresentation or error were authorized to act as they did; 3) whether the governmental misconduct involved a question of law or fact; 4) whether the government benefitted from its misrepresentation; and 5) the existence of irreversible detrimental reliance by the party claiming estoppel. *Id.* at 449. The Court focused its analysis on the public fisc factor stating that "[c]ourts are more likely to estop the government when the public fisc—in particular, Congress' power to control public expenditures—is only minimally impacted if at all." *Id.* The Court went on to conclude that in the case before it, the public fisc would only be minimally impacted which cut in favor of estoppel. *Id.* at 450. The Court's attention to the potential impact on the public fisc is understandable given the Supreme Court's *Richmond* opinion which apparently foreclosed the option of an estoppel defense against the government when the public fisc is impacted and raised doubts as to whether the defense can be used against the government under any other circumstances.

■ The rule we take from *Fredericks* is that one always has the burden of proving affirmative misconduct when asserting an estoppel defense against the government. Once there has been such a showing, the court should consider the additional factors set forth in *Fredericks*, particularly the potential impact on the public fisc, to determine whether the estoppel defense should succeed. If estoppel is to be available as a defense against the government at all, as the Third Circuit has recognized, then this rule seems sensible.

Part of the balance that the Third Circuit attempts to strike with the addition of the affirmative misconduct element is ensuring the government's ability to enforce the law. This concern encompasses more than ensuring that Congress's control over the public fisc remain unfettered. Congress often creates governmental agencies to oversee the administration of legislation which gives rise to statutory rights and obligations that do not directly impact the federal treasury. Many of these agencies, such as the Occupational Safety and Health Administration and the Nuclear Regulatory Commission, are charged with the responsibility of overseeing legislation that concerns instead important matters of public health, safety and welfare. Under WCI's theory, one could estop these agencies because the suits which are typically brought by such agencies do not impact the public fisc. This result would upset the balance that the Third Circuit seeks to achieve with the addition of the affirmative misconduct element and demonstrates that the potential impact on the public fisc is not the determinative factor on whether an estoppel defense should be allowed to succeed against a governmental entity, but is one of several factors outlined by the Third Circuit that should be taken into account when making such determination.

Indeed, even though the public fisc may not be impacted by many suits brought by a governmental entity, the recognition of a traditional estoppel defense without requiring an additional showing of affirmative misconduct, would "invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens" and severely frustrate the effi-

cient and effective implementation of important legislation. *Richmond,* 496 U.S. at 433, 110 S.Ct. 2465. Anyone who is sued by the government can usually find someone in the government who had a contrary view, whether correct or incorrect, on the matter which is the subject of the suit. Preventing governmental agencies from pursuing important statutory rights and obligations based merely on the claim of misinformation would result in a government of chaos. It seems sensible, therefore, that a showing of something more be required, such as a pattern of authorized misrepresentations going beyond mere negligence, i.e., affirmative misconduct. As the Supreme Court recognized in *Richmond,* "[i]t ignores reality to expect that the Government will be able to secure perfect performance from its hundreds of thousands of employees scattered throughout the continent." 496 U.S. at 433, 110 S.Ct. 2465 (quotation omitted).

Accordingly, we find that PBGC is the government for estoppel purposes. Thus, WCI has the burden of proving affirmative misconduct by PBGC to succeed on an estoppel defense.

### *Evidence of Affirmative Misconduct*

WCI presented no evidence of affirmative misconduct by PBGC. Without citation to any evidence, WCI baldly states that "the record clearly supports a finding of "affirmative misconduct"...." WCI's Brief In Opposition To Motion For Summary Judgment (Doc. No. 136) p. 20.

█ We note that even if the court were to assume that WCI is relying on the same facts that it alleges in support of the misrepresentation element, such facts, even if true, would not constitute affirmative misconduct.[5] As we have already discussed,

the facts as presented by WCI reveal PBGC in the performance of its statutory duty to evaluate the financial security of the BK Plans in the face of a complex business transaction, which resulted in a change of plan sponsors, and assess the application of new law to protect such plans. PBGC's changing of its initial determination to not pursue WCI for the unfunded pension liabilities does not constitute affirmative misconduct.

In *Cook v. Pension Ben. Guarantee Corp.,* 652 F.Supp. 1085 (S.D.N.Y.1987), a case on point, the district court for the Southern District of New York granted PBGC's motion for summary judgment on the grounds that the plaintiff had proffered insufficient evidence to show that PBGC had engaged in affirmative misconduct. 652 F.Supp. at 1091. The plaintiff brought suit to compel PBGC to reimburse a plan which PBGC had initially represented that it would guarantee but later refused to because its initial representation was made in error.

The court noted that PBGC had made the initial erroneous determination based upon information then available and working with a new statute. *Id.* PBGC later requested additional documents from the trustees over a three year period. *Id.* Based upon PBGC's evaluation of these later obtained documents and reconsideration of the law, the "PBGC altered its original decision in an effort to conform more closely with the intent of Congress." *Id.* The court held that

> [t]his is not a case in which a naive plaintiff has been misled by an official who has ignored mandatory regulations. There is no showing here that the Trustees and their attorneys were other than sophisticated pension fund experts and

---

**5.** *See e.g., Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (Government was not estopped from refusing to pay crop insurance benefits to plaintiffs even though they had relied to their detriment on government agent's advice that if they planted their crop on reseeded winter

wheat acreage it was insurable); *Goldberg v. Weinberger,* 546 F.2d 477 (2d Cir.1976) (Government not estopped from denying plaintiff widow's benefits when she married before the age of 60 in reliance on mistaken representations of government agent that her widow's benefits would not terminate.)

administrators such as would lead to a "manifest or gross injustice."

*Cook*, 652 F.Supp. at 1091. Just so here.

WCI was not a naive party. Indeed, it is hard to imagine an entity more sophisticated than WCI. As WCI has been quick to point out, it hired the best and the brightest professionals to analyze this transaction. Here, as in the *Cook* case, even if PBGC had been discussing its alternatives as to WCI when the July 27, 1987 letter was sent and McCulloch and Holbrook made their alleged representations, PBGC must be free to change its position as circumstances and the law change. Moreover, the granting of PBGC's motion would not lead to a manifest or gross injustice; rather, it will merely result in WCI being called to account for a risk that it knowingly and voluntarily undertook when it structured and then entered into the WCI–BKC transaction.[6]

In sum, we find that no rational trier of fact could find that PBGC engaged in affirmative misconduct.

Accordingly, PBGC's motion for summary judgment on WCI's counterclaim in recoupment and motion to strike WCI's estoppel defenses were granted.

The court issued a bench ruling on March 12, 1997 which is consistent with this memorandum opinion.

---

6. For an example of the type of circumstances in which a court has found a manifest and gross injustice, see *Corniel–Rodriguez v. I.N.S.*, 532 F.2d 301, 306 (2d Cir.1976). In *Corniel–Rodriguez*, the court held that the State Department had acted improperly when it failed to follow a rule mandating that aliens applying for entry visas be given written notice of relevant regulations. The court precluded the government from deporting an alien who was not sent the written notice of regulations and inadvertently entered the country in violation of the same. The court noted that to have ruled in favor of deportation under such circumstances would have worked a manifest and gross injustice as Congress would have approved of the State Departments regulation requiring written notification which protected aliens from the consequences of their ignorance of the complicated United States immigration laws.